**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUNG CHO, NAGLE WASHRITE LLC, DAVID DIAZ, and JAMEELAH EL-SHABAZZ, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs*, | |
| v. | Civil Action No.  1:16-cv-7961 |
| CITY OF NEW YORK, BILL DE BLASIO, in his official capacity as Mayor of the City of New York, NEW YORK CITY POLICE DEPARTMENT, JAMES P. O'NEILL, in his official capacity as New York City Police Commissioner, NEW YORK CITY LAW DEPARTMENT, and ZACHARY W. CARTER, in his official capacity as Corporation Counsel of the City of New York, | |
| *Defendants*. | |

---

**CLASS ACTION COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**

1.      This is a case about a lumbering and indiscriminate law enforcement program that forces ordinary, innocent people to waive their constitutional rights without being accused, much less convicted, of a crime. Plaintiffs, suing both individually and on behalf of classes of similarly situated individuals, seek a judgment that these coercively obtained waivers are unconstitutional and therefore unenforceable.

2.      Plaintiff Sung Cho owns and operates a laundromat near the northern tip of Manhattan. He was forced to waive his Fourth Amendment rights and right of access to the

courts simply because two individuals unconnected with his business purchased stolen electronics proffered by undercover police officers. Sung is joined by Plaintiffs David Diaz and Jameelah El-Shabazz, two apartment tenants who were forced to exclude family members from their apartments, although neither they nor their family members were accused of a crime.

3.     Plaintiffs were targeted under an ordinance that the City terms a "nuisance" eviction ordinance, but that is more aptly described as a no-fault eviction ordinance. The ordinance declares property to be a "public nuisance" and subject to closure simply because it is the *site* of an alleged criminal offense. The identity of the alleged criminal, as well as the culpability of the property owner and leaseholder, is irrelevant. Property owners and leaseholders can be (and are) punished because their property was in the wrong place at the wrong time.

4.     City attorneys churn out hundreds or even thousands of these actions every year, using form legal documents that are filled out based on stale and unreliable information provided by police. City attorneys conduct no independent investigation to ensure that their allegations are true or that eviction is warranted.

5.     City attorneys use these eviction actions to compel property owners and leaseholders to enter into settlement agreements waiving constitutional rights. As a condition of avoiding eviction, the City requires property owners and leaseholders to consent to warrantless searches, to provide unfettered access to video surveillance systems, to consent to future fines and closing orders without any requirement that the City first present evidence at a hearing before a neutral judge, and to permanently exclude family members from the home.

6.     These coercive settlement agreements violate the Fourteenth Amendment. Government cannot be allowed to use the threat of eviction to force innocent individuals— people who have not been convicted of any crime—to waive their constitutional rights.

## JURISDICTION AND VENUE

7.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

8.    Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

9.    Venue lies in this Court under 28 U.S.C. § 1391(b)(1) because Defendants reside in the judicial district.

10.    Venue also lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district. Named Plaintiffs all were targeted by the City for eviction within the judicial district.

### THE PARTIES

#### Plaintiffs

11.    Plaintiff Sung Cho is a resident of Bergen County, New Jersey, and the owner of a business located in New York County, New York. He is a victim of Defendants' practice of using New York City's no-fault eviction ordinance to extract settlements waiving constitutional rights. Sung came to this country at age 14 and became a citizen in 1981. He opened a laundromat in the Inwood neighborhood of Manhattan in 2008, and he was able to put his three children through college. In 2013, undercover police ran sting operations at the business in which the police offered to sell stolen electronics. After third parties not connected with the business took the bait and agreed to purchase these stolen electronics, police moved to shut down the laundromat under the City's no-fault eviction ordinance. To avoid eviction, Sung was forced to agree to waive his Fourth Amendment right to be free from warrantless searches and his right to

3

access the courts in advance of future sanctions. Sung is suing both in his individual capacity and as a class representative.

12.     Plaintiff Nagle Washrite LLC is a limited liability company registered in New York State, with Sung Cho as its sole member, and is the official corporate form for Sung's laundromat business. Along with Sung Cho, Nagle Washrite LLC is a victim of Defendants' practice of using New York City's no-fault eviction ordinance to extract settlements waiving constitutional rights. Nagle Washrite LLC is suing both in its individual capacity and as a class representative.

13.     Plaintiff David Diaz is a resident of Bronx County, New York, and a victim of Defendants' practice of using New York City's no-fault eviction ordinance to extract settlements waiving constitutional rights. David works as a custodian at a synagogue in the Bronx, and he lives near the Bronx Zoo in an apartment that he took over from his mother after she passed away. Police raided the apartment in 2013, arresting David and several members of his family, and found a small amount of contraband. David was not aware the contraband was in his apartment and does not know who it belonged to. Nobody arrested was ever charged with a crime in connection with the raid. Nonetheless, police sought to shut down the apartment under the City's no-fault eviction ordinance. To avoid eviction, David was forced to agree to exclude several family members from his home. David is suing both in his individual capacity and as a class representative.

14.     Plaintiff Jameelah El-Shabazz is a resident of Bronx County, New York, and a victim of Defendants' practice of using New York City's no-fault eviction ordinance to extract settlements waiving constitutional rights. Jameelah works in the maintenance department at a gym, and she lives in the South Bronx. Police raided her apartment in 2011, and they arrested her

4

and her son Akin after finding paper cups filled with what they thought were illegal drugs. The "drugs" turned out to be crushed eggshells, which Jameelah uses for religious purposes. The City settled wrongful-arrest cases brought by Jameelah and Akin. Then, one month after the settlement, police sought to shut down Jameelah's apartment under the City's no-fault eviction ordinance—citing the same discredited allegations about the crushed eggshells. To avoid Jameelah's eviction, a legal aid attorney retained by Jameelah signed an agreement under which Jameelah must exclude Akin from the apartment. Jameelah was not aware of the content of the agreement and, if she had been, would not have agreed to exclude her son from her home. Jameelah is suing both in her individual capacity and as a class representative.

## Defendants

15.     <u>Defendant City of New York ("the City")</u> is a municipal corporation organized under the constitution and laws of the State of New York.

16.     The City's officers and employees carry out an unconstitutional policy or practice of using the City's no-fault eviction ordinance to extract settlements waiving constitutional rights. The City brings no-fault eviction actions on the basis of stale and unreliable evidence, and the City pursues eviction actions against individuals who have not been convicted of any crime. The City uses these eviction actions to pressure property owners and leaseholders to enter into settlement agreements waiving rights to be free from warrantless searches, to access the courts, and to live with family members in the home.

17.     <u>Defendant Bill de Blasio</u> is the Mayor of New York City. He is responsible for supervising the New York City Police Department and the New York City Law Department. Mayor de Blasio is sued in his official capacity.

18.     <u>Defendant New York City Police Department ("NYPD")</u> is the City's primary law enforcement agency. Attorneys at the Civil Enforcement Unit of the NYPD's Legal Bureau

5

enforce the no-fault eviction ordinance by filing complaints and applications for *ex parte* closing orders, as well as by obtaining agreements to settle no-fault eviction actions. NYPD officers, meanwhile, enforce the no-fault eviction ordinance by filling out affidavits that form the basis for evictions and by executing closing orders issued under the ordinance.

19.     NYPD attorneys prepare no-fault eviction actions using form legal documents, relying on stale and unreliable information provided by NYPD officers. The NYPD routinely initiates eviction actions based on months-old evidence, without making any effort to ensure that evidence reflects current conditions at the property. In addition, in commencing eviction actions, the NYPD routinely relies on unverified statements from unnamed confidential informants making vague accusations against unnamed individuals.

20.     Once an eviction action has been filed, NYPD officers and attorneys seek to settle the action by having the property owner or leaseholder enter into an agreement waiving constitutional rights to be free from warrantless searches, to access the courts, and/or to live with family in their home. NYPD officers and attorneys routinely inform property owners and leaseholders that they should enter into settlement agreements to avoid the risk that they could be evicted if they instead try to fight the case in court.

21.     Defendant James P. O'Neill is the New York City Police Commissioner. He is responsible for overseeing the NYPD. Commissioner O'Neill is sued in his official capacity.

22.     Defendant New York City Law Department is the entity charged by ordinance with enforcing the City's no-fault eviction ordinance. N.Y.C. Code § 7-704(a). When an NYPD attorney files a complaint in an eviction case, an employee of the Law Department submits an accompanying "verification" affirming the truth of the allegations. On information and belief, attorneys with the Law Department exercise only nominal supervision over the NYPD attorneys

who file and settle eviction cases. The Law Department exercises no meaningful oversight to ensure that the NYPD's factual allegations are true and that eviction is warranted.

23.     Defendant Zachary W. Carter is Corporation Counsel of the City of New York. He is responsible for overseeing the Law Department. Mr. Carter is sued in his official capacity.

## NEW YORK CITY'S NO-FAULT EVICTION ORDINANCE

24.     New York City's no-fault eviction ordinance allows the City to evict families and businesses without having to prove that they did anything wrong, based simply on the fact that an alleged crime *occurred* at the home or business. Using this ordinance, the City is able to force innocent people—people not convicted, and in many cases not even accused, of a crime—to enter into settlements waiving constitutional rights.

25.     While labeled a "nuisance" ordinance, the City's no-fault eviction ordinance need not involve a nuisance at all, as that term is classically understood. A *classic* nuisance involves an act or failure to act that interferes with another's use or enjoyment of property. The City's ordinance, by contrast, authorizes eviction whenever a criminal offense has occurred at a property. *See* N.Y.C. Code § 7-703. The owner or leaseholder need not be responsible for the offense, and the offense need not have any demonstrable effect on the surrounding neighbors.

26.     The City need only establish the existence of the alleged underlying offense by a civil standard—no conviction necessary. Offenses encompassed by the ordinance include drug offenses, theft offenses, prostitution, obscenity, gambling, and sale of alcohol to minors.

27.     Under the ordinance, the identity of the person who committed the alleged offense is irrelevant. *See, e.g.*, *City of New York v. Partnership 91, L.P.*, 277 A.D.2d 164, 165 (N.Y. App. Div. 2000); *City of New York v. Castro*, 160 A.D.2d 651, 652 (N.Y. App. Div. 1990). The

ordinance applies even if the offense was committed by a total stranger without the knowledge (much less consent) of the property owner or leaseholder.

28.    With no defense based on innocence, the ordinance ensnares innocent occupants of homes and businesses. Data gathered by *ProPublica* and the *New York Daily News*, encompassing 516 cases filed against residences under the City's no-fault eviction ordinance between January 1, 2013 and June 30, 2014, reveals 173 people who were not convicted of a crime and yet nevertheless were forced out of homes during that period.

29.    The City overwhelmingly uses the ordinance to target minority populations. Between January 1, 2013 and June 30, 2014, nine out of ten residential properties targeted by no-fault eviction actions were located in predominantly minority communities. *ProPublica* and the *New York Daily News* were able to identify the race of 215 individuals barred from residences in eviction actions during that period, and of those 215 individuals only five were white.

30.    The ordinance allows the City to initiate an action by filing an *ex parte* motion for a "temporary closing order" sealing the location where the alleged crime occurred. N.Y.C. Code § 7-709. Under the ordinance, neither the property owner nor the leaseholder is entitled to notice or an opportunity to be heard prior to a decision on the motion.

31.    City attorneys file eviction actions using stock template documents, without conducting any meaningful investigation into the facts of the case. In an interview conducted by *ProPublica* and the *New York Daily News*, an attorney who worked filing these kinds of actions told a reporter: "Everything is kind of like, you know boilerplate, like fill in the blanks or whatever. . . . Like we get the vouchers, we just plug in the time, the date. Like there's a lot of mistakes in these [nuisance abatement] orders, you know? Like a lot of them are just a mess."

32.     The City seeks *ex parte* closing orders on the basis of affidavits from NYPD officers describing alleged illegal conduct by unnamed individuals, identified only as "John Doe" or "Jane Doe." These affidavits frequently rely on statements by unnamed confidential informants. Property owners and leaseholders are thus left in the dark as to the identity of both the accused criminal and the individual making the accusation.

33.     The City commences eviction actions many months after the alleged criminal activities underlying the action are claimed to have occurred. Between January 1, 2013 and June 30, 2014, the average time that elapsed between the alleged offense and the filing of an eviction action was five months for cases involving businesses and six months for cases involving homes.

34.     If the City prevails on the merits of a no-fault eviction action, the City can obtain an order closing the premises for up to a year, as well as civil fines of $1,000 for each day the "nuisance" was in existence. N.Y.C. Code §§ 7-714(c), 7-716(a). In addition, any final decision for the City "shall provide" for payment of "actual costs, expenses and disbursements of the city in investigating, bringing and maintaining the action." *Id.* § 7-714(g).

35.     No-fault eviction actions rarely proceed all the way to a final decision by a judge. Instead, these cases are almost always resolved by settlement.

36.     These settlement agreements involve waivers of constitutional rights. In the period between January 1, 2013 and June 30, 2014 alone, there were at least:

     a.   74 cases in which people consented to warrantless searches of their homes,

     b.   333 cases in which businesses consented to warrantless searches,

     c.   102 cases in which businesses agreed to install and provide access to security cameras,

d.  101 cases in which businesses in Manhattan agreed to imposition of further fines and penalties without judicial intervention, and

e.  118 cases in which people agreed to exclude certain individuals from their home.

37.     The City frequently demands that property owners and leaseholders agree to exclude individuals who have not been accused of a crime.  On information and belief, the City follows a policy or practice of seeking to exclude individuals who have merely been *arrested* during a raid on the home, regardless of whether the City followed up with criminal charges. Indeed, the City even seeks to evict individuals who were ultimately exonerated.

38.     In February 2016, Fern A. Fisher, Deputy Chief Administrative Judge for the New York City Courts, issued an Advisory Notice raising concerns about the City's application of its no-fault eviction ordinance. Judge Fisher noted that "occupants . . . do not have notice that their dwelling place is being closed"; supporting "affidavits are very general and do not reference an individual defendant"; "[m]any cases are commenced against Jane Doe, so there are virtually no claims in the affidavit of merit against individuals"; and "very few cases involve any direct criminal allegations against the named defendants." Judge Fisher also stated: "On the rare occasions when a defendant appears on the hearing date, virtually every time there is a stipulation of settlement where the defendants waive all of their rights."

## NEW YORK CITY FORCES LEASEHOLDERS INTO COERCIVE SETTLEMENT AGREEMENTS

### Sung Cho

39.     Sung Cho is the proprietor of Super Laundromat & Dry Cleaners, a large facility with rows of spotless, stainless-steel washers and driers. The business is formally organized as Nagle Washrite LLC, with Sung Cho as the sole member of the LLC.

40.     Sung came to the country at age 14 and, after working other jobs, decided to go into business for himself. He opened the laundromat in 2008 in Inwood, a largely Hispanic neighborhood at the northern tip of Manhattan.

41.     On two separate occasions, NYPD conducted undercover sting operations in which officers sold stolen electronics to third parties in or near Sung's store. Neither incident involved any wrongdoing by Sung or his employees.

42.     On the first occasion, an officer allegedly sold a stolen iPad Mini to an individual for $100 on January 24, 2013. Sung did not witness this incident and was not aware of it until the NYPD commenced eviction proceedings. Sung does not know whether the incident occurred inside or outside of the store, and he does not know the identity of the individual who allegedly purchased stolen property.

43.     On the second occasion, an officer sold a stolen iPhone, iPad Mini, and iPad to the son of a friend of Sung for $200 on May 17, 2013. Sung learned of this incident after the fact, when his friend informed him of the arrest. Both the alleged sale and the arrest occurred outside of Sung's store, on the nearby sidewalk.

44.     The NYPD did nothing to inform Sung of either incident and did not ask Sung to take any steps to stop this kind of incident from happening in the future.

45.     If the NYPD had asked Sung to take additional steps to stop this kind of incident from happening in or near his store, he would have cooperated with any reasonable request.

46.     The City filed a no-fault eviction action on the basis of these incidents on December 17, 2013—almost seven months after the second incident and almost one year after the first. The complaint requested an order enjoining any further activity encompassed within the ordinance's definition of a "public nuisance" and directing that the laundromat "be closed

against all use for a period of one (1) year." The complaint also requested civil penalties of $1,000 for each day that the alleged nuisance was ongoing and an award of "actual costs, expenses and disbursements in investigating, bringing and maintaining the action."

47. After the City filed its complaint, the Court set a hearing for December 24, 2013—Christmas Eve—at which Sung was to show cause why the Court should not issue a preliminary injunction closing the store. Sung scrambled to find counsel in the midst of the holiday season.

48. If Sung had attempted to contest the case, rather than accede to the City's settlement demands, the fact that neither he nor his employees had any involvement in the alleged criminal offenses would not have provided a defense to the eviction action.

49. On December 23, 2013, Sung signed a settlement agreement to end the eviction action and ensure that his business would not be shut down by the City. In the agreement, Sung agreed to waive several constitutional rights.

50. Given the risk that his store would be closed, Sung felt he had no choice other than to agree to the City's proposed settlement terms.

51. Nobody from the City made any effort to ensure that Sung's waiver of his constitutional rights was truly knowing and voluntary.

52. As a condition of settling the case, Sung agreed to waive his Fourth Amendment rights. Sung consented to unannounced warrantless inspections "for the purposes of ensuring that the subject premises . . . is not being used for *any* illegal activity." He also agreed to maintain a camera surveillance system to monitor "the entire inside and immediate vicinity outside of the establishment" and to "allow members of the NYPD to access this system to ensure it is

operational and review its recordings." Under the agreement, the camera system must "maintain images for at least a thirty (30) day period."

53.     As a condition of settling the case, Sung also agreed to waive his due process right to a hearing before an independent judicial arbiter in the event that he is accused of future violations by the NYPD. Sung agreed that if he or his "customers, employees, and/or representatives" is accused of violating *any* criminal prohibition listed in the no-fault eviction ordinance, the NYPD can close the premises "without further judicial intervention" for 30 days and assess a $5,000 fine. After that, further alleged violations would result in escalating penalties, all "without further judicial intervention." A second violation would be punished by closing the store for 60 days and imposing a fine of $10,000; a third violation 90 days and $15,000; and a fourth violation by closing the store for a period of 1 year.

54.     Sung can go to court to contest the closure of his business, but he can only do so *after* the business has already been closed. Under the agreement, the store "shall remain closed pending the Court's decision." In addition, under the agreement, any such proceeding is limited "solely" to considering "the veracity of the violation which led to the closure."

55.     Finally, as a condition of settling the case, Sung agreed that the agreement "shall apply to any successor corporation, partnership, joint venture, or other legal entity which obtains an interest in the subject premises" and that "a copy of this executed stipulation shall be made part of the sale, assignment, transfer, or sublease agreement." Sung was thus required to waive not only his own constitutional rights, but also the constitutional rights of other people.

56.     Sung is not sure why he was singled out in this way. Prior to the City's undercover sting operation, Sung was not aware of any complaint being made to the police about illegal activity occurring on the premises of the business. If such a complaint had been made,

13

Sung would have taken any reasonable steps recommended by the NYPD to prevent illegal activity from occurring in the future.

57.     Sung has always cooperated with the police, both before and after he was targeted under the City's no-fault eviction ordinance. For instance, when police asked to see security footage of the store before the events at issue, Sung voluntarily agreed to make that footage available. In addition, Sung instructed his employees to contact the police if they saw any suspicious activity or if they had any concern with illegal activity occurring at or near the store. Sung is unaware of even a single occasion when he has refused to cooperate with the police.

**David Diaz**

58.     David Diaz has worked for over a decade as a custodian at a synagogue in the Bronx, and he lives in an apartment near the Bronx Zoo. David was literally born in the apartment, and he has lived in the apartment his entire life.

59.     David took over the lease for the apartment from his mother when she passed away in August 2012.

60.     David currently lives in the apartment with his sister and his three-year-old daughter. Other members of the family have joined them over the years.

61.     The NYPD raided David's apartment on May 9, 2013, when David's family was visiting the apartment for a memorial dinner honoring David's mother. The raid happened in the morning, when everyone in the apartment was asleep. Eight or so officers busted in the door and entered with guns drawn. They handcuffed everyone, including David's 14-year-old niece. They ripped David's mattress, punched holes in his walls, put bleach on the food in the pantry, and tossed David's television to the floor.

14

62.     The police claim to have found a small amount of contraband during the raid—two rocks of cocaine, as well as a scale, straw, three razor blades, and plastic bags.

63.     David was not aware of any of this contraband being in the apartment, and he certainly would not have allowed it to remain in the apartment if he had known. David does not know who possessed this contraband.

64.     The police arrested everyone who was present at the apartment at the time of the raid, with the exception of David's niece and his infant daughter, who was allowed to stay with a relative of David's who lives nearby. The police arrested David, his two brothers, his sister, and two of David's nephews. Then, after two days, they let everyone go without pursuing charges.

65.     The City filed an action under the no-fault eviction ordinance on September 4, 2013, more than four months after the raid. The complaint alleges that the apartment was used to violate laws relating to controlled substances, but the complaint does not identify any particular individuals alleged to have violated the law.

66.     The complaint sought an order directing that the apartment "shall be closed against all use for a period of one (1) year," as well as civil penalties of $1,000 per day and the City's costs "in investigating, bringing and maintaining the action."

67.     The City obtained an *ex parte* order closing the apartment. This order was issued on the basis of an affidavit from an NYPD officer describing the May 9 raid, as well as two alleged controlled buys in which an unnamed confidential informant supposedly purchased contraband from an unnamed individual in April and May 2013. In other words, the affidavit conceals the identity of both the accuser and the accused.

68.     Because the closing order was obtained in an *ex parte* proceeding, David had no notice of these allegations and no opportunity to respond before the closing order was issued.

69.     The NYPD went to David's apartment to serve the closing order. David's sister called David while he was at work and informed him that the NYPD was at the apartment threatening them with eviction. David asked to speak with one of the officers on the phone, and he spoke to an individual who identified himself as a lawyer for the NYPD.

70.     The NYPD lawyer told David that he had the power to evict David and his family, including David's then-infant daughter. The lawyer told David the only reason he was not immediately evicting the entire family was that there was a baby in the home. The lawyer told David it was very important that David speak with him in the next several days to reach a settlement under which David and his family could continue living in the apartment.

71.     David showed up at a scheduled preliminary injunction hearing for the case on September 6, 2013, two days after the City obtained its *ex parte* closing order.

72.     David was not accompanied by an attorney, as he could not afford to pay for assistance of counsel and could not arrange for an attorney in the mere two days afforded him prior to the hearing.

73.     When David arrived at the courtroom, he was approached by a lawyer who he assumed had been appointed by the court to represent his interests. In fact, this lawyer represented the City. The lawyer advised David that it would be risky to fight the eviction action, as he and his infant daughter could end up homeless. The lawyer advised David to sign a settlement.

74.     Unable to afford to fight, and worried that he and his daughter could be evicted, David felt he had no real choice other than to agree to the City's proposed settlement terms. He therefore signed an agreement drafted by the City. The agreement allows David to remain in the

apartment, but it permanently bars every other family member who was arrested the day of the May 2013 raid and not listed on lease.

75.     Nobody from the City made any effort to ensure that David's waiver of his constitutional rights was truly knowing and voluntary.

76.     The agreement bars David's brothers from the apartment, although the City has not accused David's brothers of any crime. This condition has posed significant difficulties for David, who relies on his brothers for babysitting while he is at work. Under the agreement, David's brothers are banned from the apartment forever, at all times, regardless of their reason for visiting—even though the City has not suggested they did anything wrong.

77.     One of David's brothers, Rafael, is currently homeless. If not for the agreement, Rafael would live with David in the apartment.

### Jameelah El-Shabazz

78.     Jameelah El-Shabazz lives in the South Bronx and works in the maintenance department at an Equinox gym. She has three sons, a daughter, and an infant child. Until the events described below, all of her children lived with her in her apartment.

79.     The NYPD raided Jameelah's apartment—as well as several neighboring apartments—in May 2011. The police entered with guns drawn, and Jameelah was afraid the entire time that police would either shoot her dog (she believed she heard gunshots in a neighboring apartment) or trample her newborn child. The police destroyed Jameelah's mattress, emptied dressers and drawers, knocked furniture to the floor, and broke precious African artifacts that Jameelah had received as gifts from friends and family.

80.     The police found numerous paper cups filled with powdered eggshells in the apartment. Jameelah, who practices a traditional African faith called Ifá, uses these cups of powdered eggshells for religious ceremonies.

81.     The police believed the cups contained illegal drugs, and so they arrested Jameelah and her son Akin. The police held Jameelah and Akin in jail for a week, until laboratory tests revealed the innocuous nature of the crushed eggshells.

82.     Jameelah and Akin sued the City for wrongful arrest and imprisonment. The City settled these cases in August 2011, paying Akin $25,000 and Jameelah $12,500.

83.      On September 27, 2011, over four months after the raid and one month after settling the wrongful-arrest cases brought by Jameelah and Akin, the City filed an action against Jameelah's apartment under the no-fault eviction ordinance.

84.     The City obtained an *ex parte* order closing the apartment. This order was issued on the basis of an affidavit from an NYPD officer relaying the account of an unnamed confidential informant who claimed to have purchased drugs from unnamed individuals at the property on two occasions, as well as the officer's account of having found "forty-five (45) paper cups of cocaine" at the residence during the May 2011 search. The officer signed this affidavit notwithstanding that lab tests had already shown the paper cups did not contain illegal drugs.

85.     Because the closing order was obtained in an *ex parte* proceeding, Jameelah had no notice of these allegations and no opportunity to respond before the closing order was issued.

86.     Officers from the NYPD executed the closing order, and Jameelah returned home from work to find that police had evicted her children and placed orange and green stickers on the door stating that the apartment was closed.

87.     Jameelah was able to retain a legal aid attorney in advance of the preliminary injunction hearing scheduled for September 29, 2011.

88.     Given the difficulty and expense of actually fighting the City's eviction action, the fact that the apartment had been ordered closed pending legal proceedings, and the risk that the family (including Jameelah's infant child) could be permanently evicted, Jameelah felt she had no choice but to agree to settle.

89.     As a condition of settling the case, the City required that Jameelah agree to permanently exclude her son Akin from the apartment.

90.     In order to settle the case and ensure that Jameelah would be able to lawfully return to her apartment, Jameelah's attorney signed the City's proposed settlement agreement on Jameelah's behalf.

91.     Nobody from the City made any effort to ensure that Jameelah's waiver of her constitutional rights was truly knowing and voluntary.

92.     In fact, Jameelah did not approve the waiver of her constitutional rights. Jameelah was not aware of the content of the agreement until later, when a reporter found it and brought it to her attention.

93.     Jameelah would never voluntarily agree to exclude her own son from her home, as she believes it is her right as a mother to open her home to her children.

### INJURY TO PLAINTIFFS

94.     All of these Plaintiffs are subject to settlement agreements under which they have agreed to perpetual waivers of their constitutional rights. These agreements constitute an ongoing injury to Plaintiffs.

95.     Sung Cho (along with his business, Nagle Washrite LLC) has been injured by the permanent waiver of his Fourth Amendment rights. Under his agreement, Sung no longer enjoys the right to exclude police from the premises of his business. In addition, Sung is required to maintain video surveillance cameras on the premises of the business and provide access to those cameras to the police. Sung's inability to invoke the protections of the Fourth Amendment at his business constitutes an ongoing injury caused by the City's unconstitutional course of conduct in procuring the settlement agreement.

96.     Sung (along with his business, Nagle Washrite LLC) also has been injured by the permanent waiver of his right to access the courts. Under his agreement, Sung is subject to the risk that the NYPD may impose fines and closing orders at any time without any warning and without any prior opportunity for Sung to present a defense to a neutral judge. Sung worries that the NYPD could shut down his laundromat at any time, simply because they believe a customer did something illegal. Sung's inability to invoke the right to access the courts for a hearing before a neutral arbiter constitutes an ongoing injury caused by the City's unconstitutional course of conduct in procuring the settlement agreement.

97.     Sung (along with his business, Nagle Washrite LLC) has been injured because the settlement agreement reduces the value of his business. Sung cannot sell his business, under the agreement, without ensuring that the new owner is also bound by these waivers of constitutional rights—a fact that will necessarily reduce the amount buyers are willing to pay. This impact on the business's value constitutes an ongoing injury caused by the City's unconstitutional course of conduct in procuring the settlement agreement.

98.     David Diaz has been injured by the permanent waiver of his right to choose whether to allow family members to live with him in his home. Under his agreement, David is

20

required to permanently exclude his two brothers from his apartment, even though the City has not alleged any wrongdoing by those family members. This inability to exercise the right to familial association constitutes an ongoing injury caused by the City's unconstitutional course of conduct in procuring the settlement agreement.

99.     The agreement's requirement that David exclude his family members from the apartment is particularly burdensome because David relies on his brothers to babysit his daughter while he is at work. Under the agreement, his brothers cannot come to the apartment for any reason—even to care for his child.

100.    But for the agreement, David's brother Rafael would live with David in the apartment. Instead, Rafael is currently homeless.

101.    Jameelah El-Shabazz has likewise been injured by the permanent waiver of her right to choose whether to allow family members to live with her in her home. Under her agreement, Jameelah is required to permanently exclude her son from the apartment, even though the City has not alleged any wrongdoing by her son. This inability to exercise the right to familial association constitutes an ongoing injury caused by the City's unconstitutional course of conduct in procuring the settlement agreement.

102.    But for the agreement, Jameelah would never exclude her son from her home. Jameelah believes strongly that, as a mother, she should be able to provide a place for her son to visit, eat, sleep, and live. The agreement's provision excluding Jameelah's son from the apartment has caused Jameelah a great deal of worry, stress, and upset, as she feels it interferes with her ability to do her job as a mother.

## CLASS ACTION ALLEGATIONS

103.    The City's conduct towards Plaintiffs is part of a broader policy or practice, in which the City uses no-fault eviction cases to obtain coercive settlements waiving constitutional rights from individuals who have not been convicted (much less accused) of a crime.

104.    On information and belief, discovery will show that the City maintains annual targets to file large numbers of cases under its no-fault eviction ordinance. To meet these targets, city officials file no-fault eviction actions against individuals who have not been convicted of the underlying alleged crime and who bear no responsibility for the alleged criminal conduct at their property.

105.    The City prepares papers to be filed in eviction actions using document templates. Attorneys for the City fill in these document templates based on information provided by the NYPD, without actually verifying the accuracy of that information.

106.    The City regularly files no-fault eviction actions that do not identify the individuals responsible for the alleged criminal offenses underlying the actions.

107.    The City also regularly files no-fault eviction actions based on highly unreliable statements from unnamed confidential informants.

108.    The evidence underlying these no-fault eviction actions is typically stale, as months pass between the alleged offenses and the filing of an eviction action. City officials make no effort to verify that the alleged "nuisance" is still ongoing prior to filing.

109.    City officials do not seek to litigate these eviction actions to a final decision. Instead, city officials file these actions in order to pressure property owners and leaseholders to enter into settlement agreements waiving constitutional rights.

110.    City officials inform property owners and leaseholders that they must agree to waive their constitutional rights as a condition of settlement and that, if they refuse to execute such a waiver, they will face both the expense of fighting the case in court and the risk that they will ultimately be evicted from their home or business under the City's ordinance—which, after all, provides no defense based on innocence.

111.    On information and belief, this policy or practice has been ongoing for decades, as city officials initiated this use of the no-fault eviction ordinance in the 1990s. In a prominent article from 1995, New York's then-Police Commissioner identified the ability to "confiscate, close, or temporarily seize property" as an important law enforcement power and the City's no-fault eviction ordinance as "the most powerful civil tool available."

112.    The existence of this policy or practice is confirmed by statistical evidence. An investigation of actions filed between January 1, 2013 and June 30, 2014 found hundreds of settlement agreements waiving constitutional rights that were obtained over just that eighteen-month period. On information and belief, discovery will reveal hundreds or even thousands of additional settlement agreements encompassed by the claims in this case.

113.    The existence of this policy or practice is also confirmed by the recent Advisory Notice issued by Fern A. Fisher, Deputy Chief Administrative Judge for the New York City Courts. Judge Fisher stated that, "when a defendant appears on the hearing date, virtually every time there is a stipulation of settlement where the defendants waive all of their rights."

114.    To remedy this policy or practice, Plaintiffs seek to sue on behalf of two classes and three subclasses, raising five distinct constitutional claims.

115.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Hundreds or even thousands of individuals are subject to

23

constitutionally invalid settlements obtained through the City's unconstitutional course of conduct. All of those agreements are invalid for the same reasons. Allowing all of those agreements to be challenged in a single lawsuit will avoid needless litigation expense, both for the absent class members and for Defendants.

### Right To Pre-Seizure Hearing
### (Closing Order Class)

116.    The City engages in a policy or practice of using *ex parte* closing orders to pressure property owners and leaseholders to agree to settlements waiving constitutional rights.

117.    The City obtains these *ex parte* closing orders without any notice to the property owner or leaseholder, meaning that the leaseholder or property owner has no meaningful prior opportunity to offer a defense to the City's allegations. The first time the property owner or leaseholder learns that they have been ordered evicted from their home or business is when the order is served on the premises by the NYPD.

118.    When executing *ex parte* closing orders, City police and attorneys follow a policy or practice of advising property owners and leaseholders that they should negotiate a settlement agreement in order to lift the eviction. Agreements waiving constitutional rights are thus explicitly presented as an alternative to eviction.

119.    *Class Definition* — Plaintiffs propose the following class definition for this claim: All persons (natural or incorporated) who are currently subject to or who will enter into agreements with the City of New York to settle no-fault eviction actions following entry of an *ex parte* closing order (the "Closing Order Class").

120.    *Class Representatives* — Plaintiffs Jameelah El-Shabazz and David Diaz are representatives for the Closing Order Class.

121.    *Type of Class* — The City's unconstitutional policy or practice is appropriately addressed through a class certified under Rule 23(b)(2), as Defendants have acted on grounds that apply generally to the Closing Order Class, such that final injunctive relief as well as corresponding declaratory relief is appropriate respecting the class as a whole. As described above, Defendants have adopted an unconstitutional policy or practice of obtaining *ex parte* closing orders excluding individuals from real property and then requiring individuals to enter into settlements as a condition of lifting the unconstitutional closing orders. That policy or practice is appropriately remedied via a declaration that all settlements obtained following entry of such an *ex parte* closing order are unconstitutional and unenforceable, as well as by an injunction barring Defendants from obtaining *ex parte* closing orders in the future and from enforcing all agreements exacted in eviction actions following entry of such an order.

122.    *Rule 23(a)(1), Numerosity* — The Closing Order Class is so numerous that joinder of all members is impracticable.  The City's no-fault eviction ordinance has been in place since 1977, and during that time the City has filed thousands of eviction actions. Given the City's policy or practice of seeking *ex parte* closing orders in nearly every case, as well as the City's policy or practice of using those closing orders to obtain settlement agreements, the number of members of the proposed class will number in the hundreds or even the thousands.  In the period between January 1, 2013 and June 30, 2014 alone, Defendants obtained 676 *ex parte* closing orders in no-fault eviction cases, and virtually all those cases ended in settlements.

123.    *Rule 23(a)(2), Commonality* — This claim presents questions of law and fact common to the Closing Order Class, resolution of which will not require individualized determinations of the circumstances of any particular Plaintiff.  Common questions include, but are not limited to:

25

a. Whether the City has a policy or practice of obtaining *ex parte* closing orders without affording property owners and leaseholders notice and an opportunity to be heard.

b. Whether the City's policy or practice of obtaining *ex parte* closing orders violates *United States v. James Daniel Good*, 510 U.S. 43 (1993).

c. Whether the City offers to enter into agreements lifting *ex parte* closing orders if individuals evicted from their homes or businesses agree, in exchange, to waive constitutional rights.

d. Whether this policy or practice of using *ex parte* closing orders to obtain waivers of constitutional rights renders those waivers unconstitutional and unenforceable.

124.  *Rule 23(a)(3), Typicality* — The claims of the proposed class representatives are typical of the claims of the Closing Order Class, as they arise out of the same course of conduct by Defendants, are based on the same legal theories, and involve the same harms.  Like other members of the Closing Order Class, the proposed class representatives were subjected to unconstitutional *ex parte* closing orders and entered into settlements imposed as a condition of lifting the unconstitutional closing orders.

125.  *Rule 23(a)(4), Adequacy* — The interests of the Closing Order Class are fairly and adequately protected by the proposed class representatives and their attorneys:

a. The proposed class representatives adequately represent the Closing Order Class because their interests are aligned and there are no conflicts of interest between the proposed class representatives and members of the putative class.

b. The proposed class representatives and putative class members are ably represented *pro bono* by the Institute for Justice, joined by local counsel at

26

Golenbock, Eiseman, Assor, Bell & Peskoe LLP. The Institute for Justice is a

nonprofit, public-interest law firm that litigates constitutional issues nationwide.

The Institute for Justice has particular expertise protecting property rights,

including raising similar due process claims on behalf of a class of property

owners in Philadelphia. *See Sourovelis v. City of Philadelphia*, 103 F. Supp. 3d

694, 701 (E.D. Pa. 2015) (detailing how city changed policies to provide for pre-

seizure hearings following suit filed by Institute for Justice). In bringing this

action, the Institute for Justice has done extensive work to identify and investigate

Plaintiffs' claims.

### Right To Defense Based On Innocence
### (Innocent Occupant Class)

126.    The City engages in a policy or practice of pursuing no-fault eviction actions

against individuals who have not been convicted of the underlying alleged criminal offense.

127.    Under the City's no-fault eviction ordinance, the fact that the property owner or

leaseholder did not commit the alleged criminal offenses underlying the action is not a defense.

Individuals may be evicted from their homes or businesses based on crimes they did not commit.

128.    The lack of any defense based on innocence provides the City with extraordinary

leverage to pressure property owners and leaseholders into settlement agreements. Even if they

did nothing wrong, individuals face the stark reality that they can be evicted from their home or

business simply because a crime *occurred* on the premises. To avoid this possibility, individuals

are forced to enter into settlements waiving constitutional rights.

129.    *Class Definition* — Plaintiffs propose the following class definition for this claim:

All persons (natural or incorporated) who are currently subject to or who will enter into

agreements with the City of New York to settle no-fault eviction actions and who have not been convicted of the alleged underlying criminal offense (the "Innocent Occupant Class").

130.    *Class Representatives* — Plaintiffs Sung Cho, David Diaz, Jameelah El-Shabazz, and Nagle Washrite LLC are representatives for the Innocent Occupant Class.

131.    *Type of Class* — The City's unconstitutional policy or practice is appropriately addressed through a class action certified under Rule 23(b)(2), as Defendants have acted on grounds that apply generally to the Innocent Occupant Class, so that final injunctive relief as well as corresponding declaratory relief is appropriate respecting the class as a whole. As described above, Defendants have adopted an unconstitutional policy or practice of using the lack of an innocent occupant defense in the no-fault eviction ordinance to pressure property owners and leaseholders to waive their constitutional rights. That policy or practice is appropriately remedied via a declaration that all waivers of constitutional rights obtained in no-fault eviction actions from individuals not convicted of the underlying criminal offense are unconstitutional and unenforceable, as well as by an injunction barring Defendants from enforcing all such agreements and from procuring such agreements in the future.

132.    *Rule 23(a)(1), Numerosity* — The Innocent Occupant Class is so numerous that joinder of all members is impracticable.  The City's no-fault eviction ordinance has been in place since 1977, and during that time the City has filed thousands of eviction actions. Given the City's policy or practice of filing such actions without regard to whether the occupant is convicted of committing the alleged criminal offense underlying the complaint, the number of members of the proposed class will number in the hundreds or even thousands.

133.    *Rule 23(a)(2), Commonality* — This claim presents questions of law and fact common to the Innocent Occupant Class, resolution of which will not require individualized

determinations of the circumstances of any particular plaintiff.  Common questions include, but are not limited to:

    a.   Whether the City has a policy or practice of pursuing no-fault eviction actions against individuals who have not been convicted of the alleged underlying criminal offense.

    b.   Whether the failure of the no-fault eviction ordinance to provide a defense based on innocence renders the ordinance unconstitutional.

    c.   Whether the City offers to cease pursuing no-fault eviction actions brought against innocent individuals if those individuals agree to enter into agreements waiving their constitutional rights.

    d.   Whether the City's policy or practice of using no-fault eviction actions filed against innocent individuals to obtain waivers of constitutional rights renders those waivers unconstitutional and unenforceable.

134.    *Rule 23(a)(3), Typicality* — The claims of the proposed class representatives are typical of the claims of the Innocent Occupant Class, as they arise out of the same course of conduct by Defendants, are based on the same legal theories, and involve the same harms.  Like other members of the proposed class, the proposed class representatives were subjected to eviction actions based on crimes there were never found responsible for committing and then forced to waive their constitutional rights to bring the action to a close.

135.    *Rule 23(a)(4), Adequacy* — The interests of the Innocent Occupant Class are fairly and adequately protected by the proposed class representatives and their attorneys:

    e.    The proposed class representatives adequately represent the putative class because their interests are aligned and there are no conflicts of interest between the proposed class representatives and members of the putative class.

    f.    The proposed class representatives and putative class members are ably represented *pro bono* by the Institute for Justice, joined by local counsel at Golenbock, Eiseman, Assor, Bell & Peskoe LLP. The Institute for Justice is a nonprofit, public-interest law firm that litigates constitutional issues nationwide. The Institute for Justice has particular expertise in protecting property rights, including raising similar due process claims on behalf of a class of property owners in Philadelphia. *See Sourovelis v. City of Philadelphia*, 103 F. Supp. 3d 694, 701 (E.D. Pa. 2015). In bringing this action, the Institute for Justice has done extensive work to identify and investigate Plaintiffs' claims.

### Right To Be Free From Warrantless Searches
### (Warrantless Search Subclass)

136.    The City engages in a policy or practice of using the threat of eviction under its no-fault eviction ordinance to coerce innocent leaseholders and property owners to waive their constitutional right to be free from warrantless searches under the Fourth Amendment.

137.    The City regularly tells leaseholders and property owners that, if they want to avoid eviction under the City's no-fault eviction ordinance, they must enter into settlements consenting to warrantless searches of their home or business.

138.    The City also regularly tells leaseholders and property owners that, if they want to avoid eviction under the City's no-fault eviction ordinance, they must enter into settlements agreeing to place surveillance cameras on their property and provide NYPD with access to surveillance footage.

139.     The City demands these waivers of Fourth Amendment rights without regard to whether the leaseholders or property owners are themselves accused of any criminal conduct. Sung Cho, for instance, was forced to waive his Fourth Amendment rights based on criminal conduct by customers and other visitors who had no relation to his business.

140.     The City also demands these waivers of Fourth Amendment rights without regard to whether leaseholders and property owners have cooperated with police in the past to combat criminal activity. Sung Cho, for instance, had voluntarily provided NYPD officers with access to surveillance footage on request in the past and had cooperated with every prior request for assistance from the NYPD.

141.     *Class Definition* — Plaintiffs propose the following subclass definition for this claim: All members of the Innocent Occupant Class whose agreements consent to warrantless searches of their home or business, including both searches of the physical premises and video surveillance (the "Warrantless Search Subclass").

142.     *Class Representatives* — Plaintiffs Sung Cho and Nagle Washrite LLC are representatives for the Warrantless Search Subclass.

143.     *Type of Class* — The City's unconstitutional policy or practice is appropriately addressed through a subclass certified under Rule 23(b)(2), as Defendants have acted on grounds that apply generally to the Warrantless Search Subclass, so that final injunctive relief as well as corresponding declaratory relief is appropriate respecting the subclass as a whole. As described above, Defendants have adopted an unconstitutional policy or practice of requiring innocent individuals to waive their right to be free from warrantless searches as a condition of settling eviction cases. That policy or practice is appropriately remedied via a declaration that all such agreements are unconstitutional and unenforceable, as well as by an injunction barring

31

Defendants from enforcing all such agreements and from procuring such agreements in the future.

144.    *Rule 23(a)(1), Numerosity* — The Warrantless Search Subclass is so numerous that joinder of all members is impracticable.  The City's no-fault eviction ordinance has been in place since 1977, and during that time the City has filed thousands of eviction actions. Given the City's policy or practice of seeking settlement agreements waiving the right to be free from warrantless searches, the number of members of the proposed subclass will number in the hundreds or even the thousands. In the period between January 1, 2013 and June 30, 2014 alone, Defendants obtained over 400 agreements in no-fault eviction cases consenting to warrantless searches.

145.    *Rule 23(a)(2), Commonality* — This claim presents questions of law and fact common to the Warrantless Search Subclass, resolution of which will not require individualized determinations of the circumstances of any particular plaintiff.  Common questions include, but are not limited to:

   a.   Whether the City follows a policy or practice of requiring leaseholders and property owners to waive their Fourth Amendment rights—consenting to warrantless searches and granting access to camera surveillance systems—in order to avoid eviction under the City's no-fault eviction ordinance.

   b.   Whether the City extracts waivers of Fourth Amendment rights even from leaseholders and property owners who have not been convicted of the underlying alleged criminal offense.

    c.   Whether agreements obtained by the City from members of the Warrantless Search Subclass waiving the right to be free from warrantless search and surveillance are unconstitutional and unenforceable.

146.   *Rule 23(a)(3), Typicality* — The claims of the proposed subclass representatives are typical of the claims of the Warrantless Search Subclass, as they arise out of the same course of conduct by Defendants, are based on the same legal theories, and involve the same harms. Like other members of the Warrantless Search Subclass, the proposed subclass representatives were coerced by the City to sign agreements consenting to warrantless searches.

147.   *Rule 23(a)(4), Adequacy* — The interests of the Warrantless Search Subclass are fairly and adequately protected by the proposed subclass representatives and their attorneys:

    a.   The proposed subclass representatives adequately represent the Warrantless Search Subclass because their interests are aligned and there are no conflicts of interest between the proposed subclass representatives and members of the putative subclass.

    b.   The proposed subclass representatives and putative subclass members are ably represented *pro bono* by the Institute for Justice, joined by local counsel at Golenbock, Eiseman, Assor, Bell & Peskoe LLP. The Institute for Justice is a nonprofit, public-interest law firm that litigates constitutional issues nationwide. The Institute for Justice has particular expertise protecting property rights, including raising similar unconstitutional conditions claims on behalf of a class of property owners in Philadelphia. *See Sourovelis v. City of Philadelphia*, 103 F. Supp. 3d 694, 707 (E.D. Pa. 2015) (ruling claims may proceed past motion to

dismiss). In bringing this action, the Institute for Justice has done extensive work to identify and investigate Plaintiffs' claims.

**Right To Access The Courts**
**(Access To Court Subclass)**

148.    The City engages in a policy or practice of using the threat of eviction under its no-fault eviction ordinance to coerce innocent leaseholders and property owners to waive their constitutional right to access the courts to obtain a hearing before a neutral arbiter prior to imposition of sanctions for alleged unlawful conduct.

149.    The City regularly tells leaseholders and property owners that, if they want to avoid eviction under the City's no-fault eviction ordinance, they must enter into settlement agreements consenting to future sanctions without need for judicial intervention.

150.    Sanctions imposed by the City without judicial intervention, pursuant to these agreements, include monetary fines of thousands of dollars as well as orders closing businesses for days, months, or even up to a year.

151.    *Class Definition* — Plaintiffs propose the following subclass definition for this claim: All members of the Innocent Occupant Class whose agreements consent to imposition of penalties for alleged future unlawful behavior without a prior judicial hearing (the "Access to Courts Subclass").

152.    *Class Representatives* — Plaintiffs Sung Cho and Nagle Washrite LLC are representatives for the Access to Courts Subclass.

153.    *Type of Class* — The City's unconstitutional policy or practice is appropriately addressed through a subclass certified under Rule 23(b)(2), as Defendants have acted on grounds that apply generally to the Access to Courts Subclass, so that final injunctive relief as well as corresponding declaratory relief is appropriate respecting the subclass as a whole. As described

34

above, Defendants have adopted an unconstitutional policy or practice of requiring innocent individuals to waive their right of access to the courts as a condition of settling no-fault eviction cases. That unconstitutional practice is appropriately remedied via a declaration that all such agreements are invalid, unconstitutional, and unenforceable, as well as by an injunction barring Defendants from enforcing all such agreements that have been exacted in no-fault eviction actions and from procuring such agreements in the future.

154.   *Rule 23(a)(1), Numerosity* — The Access to Courts Subclass is so numerous that joinder of all members is impracticable.  The City's no-fault eviction ordinance has been in place since 1977, and during that time the City has filed thousands of eviction actions. Given the City's policy or practice of seeking settlement agreements consenting to penalties for alleged unlawful behavior imposed without any judicial oversight, the number of members of the proposed subclass number in the hundreds or even the thousands. In the period between January 1, 2013 and June 30, 2014 alone, limiting the search just to businesses located in Manhattan, Defendants obtained over 100 agreements in no-fault eviction cases consenting to sanctions for alleged criminal offenses without any need for judicial intervention.

155.   *Rule 23(a)(2), Commonality* — This claim presents questions of law and fact common to the Access to Courts Subclass, resolution of which will not require individualized determinations of the circumstances of any particular plaintiff.  Common questions include, but are not limited to:

> a.   Whether the City follows a policy or practice of requiring leaseholders and property owners to waive their right to access the courts—giving up their right to obtain a hearing before a neutral judge prior to imposition of future sanctions—in order to avoid eviction under the City's no-fault eviction ordinance.

35

b. Whether the City extracts waivers of the right of access to the courts even from leaseholders and property owners who have not been convicted of the underlying alleged criminal offense.

c. Whether agreements obtained by the City from members of the Access to Courts Subclass waiving the right of access to the courts are unconstitutional and unenforceable.

156.  *Rule 23(a)(3), Typicality* — The claims of the proposed subclass representatives are typical of the claims of the Access to Courts Subclass, as they arise out of the same course of conduct by Defendants, are based on the same legal theories, and involve the same harms.  Like other members of the proposed class, the proposed subclass representatives were coerced by the City to sign agreements consenting to imposition of penalties without judicial oversight.

157.  *Rule 23(a)(4), Adequacy* — The interests of the Access to Courts Subclass are fairly and adequately protected by the proposed subclass representatives and their attorneys:

a. The proposed subclass representatives adequately represent the Access to Courts Subclass because their interests are aligned and there are no conflicts of interest between the proposed representatives and members of the putative subclass.

b. The proposed subclass representatives and putative subclass members are ably represented *pro bono* by the Institute for Justice, joined by local counsel at Golenbock, Eiseman, Assor, Bell & Peskoe LLP. The Institute for Justice is a nonprofit, public-interest law firm that litigates constitutional issues nationwide. The Institute for Justice has particular expertise protecting property rights, including raising similar unconstitutional conditions claims on behalf of a class of property owners in Philadelphia. *See Sourovelis v. City of Philadelphia*, 103 F.

Supp. 3d 694, 707 (E.D. Pa. 2015) (ruling claims may proceed past motion to

dismiss). In bringing this action, the Institute for Justice has done extensive work

to identify and investigate Plaintiffs' claims.

### Right To Familial Association
### (Familial Association Subclass)

158.    The City has a policy or practice of using the threat of eviction under its no-fault

eviction ordinance to coerce leaseholders and property owners to waive their constitutional right

to live with family members in their homes.

159.    The City regularly tells residential leaseholders and property owners that, if they

want to avoid eviction from their home under the City's no-fault eviction ordinance, they must

enter into settlement agreements permanently excluding family members—including spouses,

children, step-children, siblings, and half siblings—from the home.

160.    After the City conducts a raid on an apartment, the City follows a policy or

practice of demanding exclusion of individuals arrested during the raid but not named on the

apartment lease. The City pursues this strategy regardless of whether the person arrested during

the raid was actually accused of a crime. For instance, the City demanded that Jameelah El-

Shabazz evict her son Akin even after paying a settlement to Akin in his action for wrongful

arrest, and the City demanded that David Diaz evict his brothers even though the City has not

alleged that they are guilty of a crime.

161.    The City engages in this policy or practice of demanding exclusion of identified

family members without alleging—much less providing evidence—that these individuals are

guilty of any criminal behavior. Indeed, when filing no-fault eviction actions, the City does not

directly name the individuals who are believed to have engaged in criminal behavior.

162.    The City also engages in this policy or practice of demanding exclusion of family members without regard to whether the excluded individuals have been convicted of the alleged criminal offense underlying the eviction action.

163.    *Class Definition* — Plaintiffs propose the following subclass definition for this claim: All members of the Innocent Occupant Class whose agreements require them to exclude immediate family members (spouses, children, step-children, parents, step-parents, siblings, or half-siblings) from their home (the "Familial Association Subclass").

164.    *Class Representatives* — Plaintiffs Jameelah El-Shabazz and David Diaz are representatives for the Familial Association Subclass.

165.    *Type of Class* — The City's unconstitutional policy or practice is appropriately addressed through a subclass certified under Rule 23(b)(2), as Defendants have acted on grounds that apply generally to the Familial Association Subclass, so that final injunctive relief as well as corresponding declaratory relief is appropriate respecting the subclass as a whole. As described above, Defendants have adopted an unconstitutional policy or practice of requiring innocent individuals to waive their right to live with family members as a condition of settling eviction cases. That policy or practice is appropriately remedied via a declaration that all such agreements are unconstitutional and unenforceable, as well as by an injunction barring Defendants from enforcing all such agreements that have been exacted in eviction actions and from procuring such agreements in the future.

166.    *Rule 23(a)(1), Numerosity* — The Familial Association Subclass is so numerous that joinder of all members is impracticable.  The City's no-fault eviction ordinance has been in place since 1977, and during that time the City has filed thousands of eviction actions. Given the City's policy or practice of seeking settlement agreements excluding individuals from their

family members' homes, the number of members of the proposed class will number in the hundreds or even the thousands. In the period between January 1, 2013 and June 30, 2014 alone, Defendants obtained 118 agreements in no-fault eviction cases permanently barring named individuals from homes.

167. *Rule 23(a)(2), Commonality* — This claim presents questions of law and fact common to the Familial Association Subclass, resolution of which will not require individualized determinations of the circumstances of any particular plaintiff. Common questions include, but are not limited to:

    a. Whether the City has a policy or practice of requiring leaseholders and property owners to waive the right to familial association—permanently excluding members of their immediate family from their homes—in order to avoid the threat of eviction.

    b. Whether the City extracts waivers of the right to familial association even from leaseholders and property owners who have not been convicted of the underlying alleged criminal offense.

    c. Whether agreements obtained by the City from members of the Familial Association Subclass waiving the right to familial association are unconstitutional and unenforceable.

168. *Rule 23(a)(3), Typicality* — The claims of the proposed subclass representatives are typical of the claims of the Familial Association Subclass, as they arise out of the same course of conduct by Defendants, are based on the same legal theories, and involve the same harms. Like other members of the proposed subclass, the proposed subclass representatives were coerced by the City to sign agreements excluding immediate family members from their home.

169.  *Rule 23(a)(4), Adequacy* — The interests of the Familial Association Subclass are fairly and adequately protected by the proposed class representatives and their attorneys:

    a.  The proposed subclass representatives adequately represent the Familial Association Subclass because their interests are aligned and there are no conflicts of interest between the proposed subclass representatives and members of the putative subclass.

    b.  The proposed subclass representatives and putative subclass members are ably represented *pro bono* by the Institute for Justice, joined by local counsel at Golenbock, Eiseman, Assor, Bell & Peskoe LLP. The Institute for Justice is a nonprofit, public-interest law firm that litigates constitutional issues nationwide. The Institute for Justice has particular expertise in protecting property rights, including raising similar unconstitutional conditions claims on behalf of a class of property owners in Philadelphia. *See Sourovelis v. City of Philadelphia*, 103 F. Supp. 3d 694, 707 (E.D. Pa. 2015) (ruling claims may proceed past motion to dismiss). In bringing this action, the Institute for Justice has done extensive work to identify and investigate Plaintiffs' claims.

## CLASS ACTION COUNTS

### <u>Count I:</u>
### VIOLATION OF 42 U.S.C. § 1983
### FAILURE TO AFFORD
### PRE-SEIZURE HEARING
#### On Behalf Of Class Representatives Jameelah El-Shabazz And David Diaz
#### Individually And On Behalf Of The Closing Order Class

170.  All preceding allegations are incorporated here as if set forth in full.

171.  The City pursues a policy or practice of obtaining *ex parte* closing orders without any notice to property owners and leaseholders, without providing any pre-seizure opportunity

for property owners and leaseholders to respond or be heard, and without any showing that this *ex parte* procedure is justified by exigent circumstances.

172.    The City pursues this policy or practice of obtaining *ex parte* closing orders notwithstanding the Supreme Court's holding in *United States v. James Daniel Good*, 510 U.S. 43 (1993), that, absent exigent circumstances, the Constitution requires notice and a hearing before seizures of real property. The City's policy or practice of obtaining *ex parte* closing orders is thus a knowing, flagrant violation of the Constitution.

173.    City attorneys engage in a policy or practice of filing papers seeking *ex parte* closing orders without doing any meaningful factual investigation into the case. Motions for *ex parte* closing orders are commonly based on information of dubious validity, including months-old statements from unnamed confidential informants.

174.    The City engages in a policy or practice of using *ex parte* closing orders to pressure property owners and leaseholders into settlement agreements waiving constitutional rights. City police and attorneys routinely inform property owners and leaseholders that they must consent to agreements in order to avoid eviction.

175.    Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct. Without declaratory and injunctive relief, members of the putative class will continue to be subject to settlements obtained through unconstitutional coercion.

176.    Plaintiffs are entitled to a judgment that the City's policy or practice of obtaining *ex parte* closing orders is unconstitutional and must be enjoined.

177.    In addition, Plaintiffs are entitled to a judgment that agreements obtained by the City from property owners and leaseholders subject to unconstitutional, *ex parte* closing orders are the product of unconstitutional coercion and accordingly unenforceable.

41

**Count II:**
**VIOLATION OF 42 U.S.C. § 1983**
**FAILURE TO AFFORD**
**DEFENSE BASED ON INNOCENCE**
**On Behalf Of Class Representatives Sung Cho, David Diaz, Jameelah El-Shabazz,**
**And Nagle Washrite LLC Individually And On Behalf Of The Innocent Occupant Class**

178.    All preceding allegations are incorporated here as if set forth in full.

179.    The City engages in a policy or practice of pursuing no-fault eviction actions against individuals who are not convicted or accused of committing the criminal offenses constituting the supposed "public nuisance" justifying eviction.

180.    The City is able to pursue this policy or practice because the City's no-fault eviction ordinance does not provide any defense based on innocence. Under the ordinance, the fact that a crime was committed by a different person is not a defense.

181.    The ordinance's failure to provide a defense based on innocence violates the Fourteenth Amendment to the United States Constitution.

182.    The City engages in a policy or practice of using no-fault eviction actions to pressure property owners and leaseholders who have not been convicted of any crime into settlements waiving constitutional rights. City police and attorneys routinely inform property owners and leaseholders that they must consent to agreements in order to avoid eviction.

183.    Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct. Without declaratory and injunctive relief, members of the putative class will continue to be subject to settlements obtained through unconstitutional coercion.

184.    Plaintiffs are entitled to a judgment that the City's policy or practice of using the ordinance's lack of an innocent owner defense to pressure property owners and leaseholders into settlement agreements waiving constitutional rights is unconstitutional and must be enjoined.

185.    In addition, Plaintiffs are entitled to a judgment that agreements waiving constitutional rights, and obtained in no-fault eviction proceedings from property owners and leaseholders not convicted of the underlying alleged offense, are the product of unconstitutional coercion and accordingly unenforceable.

**Count III:**
**VIOLATION OF 42 U.S.C. § 1983**
**COERCIVE WAIVER OF RIGHT**
**TO BE FREE FROM WARRANTLESS SEARCHES**
**On Behalf Of Class Representatives Sung Cho And Nagle Washrite LLC**
**Individually And On Behalf Of The Warrantless Search Subclass**

186.    All preceding allegations are incorporated here as if set forth in full.

187.    The City pursues a policy or practice of requiring innocent individuals, as a condition of avoiding eviction in no-fault eviction cases, to sign agreements waiving their Fourth Amendment right to be free from warrantless searches (including both consenting to physical searches and agreeing to provide access to camera surveillance systems).

188.    The City pursues these agreements without regard to whether the individuals required to waive their Fourth Amendment rights have been convicted or even accused of any crime. As a result, the City regularly imposes such agreements on individuals who have *not* been convicted or accused of any offense.

189.    The City follows this policy or practice notwithstanding that the Fourth Amendment prohibits the government from requiring blanket waivers of the right to be free from warrantless searches outside the context of closely regulated industries. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978).

190.    The City's policy or practice of requiring innocent leaseholders and property owners to waive their right to be free from warrantless searches in order to avoid eviction violates the Due Process Clause of the Fourteenth Amendment.

43

191.     Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct. Without declaratory and injunctive relief, members of the putative subclass will continue to be subject to settlement agreements that infringe on their right to be free from warrantless searches.

192.     Plaintiffs are entitled to a judgment that the City's policy or practice of using the threat of eviction to coerce property owners and leaseholders to waive their right to be free from warrantless searches is unconstitutional and must be enjoined.

193.     In addition, Plaintiffs are entitled to a judgment that settlement agreements obtained by the City in no-fault eviction cases purporting to waive the constitutional right to be free from warrantless searches are invalid and unenforceable.

**Count IV:**
**VIOLATION OF 42 U.S.C. § 1983**
**COERCIVE WAIVER OF RIGHT**
**OF ACCESS TO THE COURTS**
**On Behalf Of Class Representatives Sung Cho And Nagle Washrite LLC**
**Individually And On Behalf Of The Access To Courts Subclass**

194.     All preceding allegations are incorporated here as if set forth in full.

195.     The City pursues a policy or practice of requiring innocent individuals, as a condition of avoiding eviction under the no-fault eviction ordinance, to sign agreements consenting to imposition of future sanctions for future alleged criminal offenses without judicial intervention and thus waiving their constitutional right to access the courts to obtain a hearing before a neutral judge prior to being subjected to such future sanctions.

196.     The City pursues these agreements without regard to whether the individuals required to waive their right of access to the courts have been convicted or even accused of any crime. As a result, the City regularly imposes such agreements on individuals who have *not* been convicted or accused of any offense.

197.    The City follows this policy or practice notwithstanding that the Constitution guarantees the right to a hearing and opportunity to be heard prior to deprivations of property, including "an informed evaluation by a neutral official." *Fuentes v. Shevin*, 407 U.S. 67, 83 (1972).

198.    The City's policy or practice of requiring property owners and leaseholders to waive their right of access to the courts in order to avoid eviction violates the Due Process Clause of the Fourteenth Amendment.

199.    Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct. Without declaratory and injunctive relief, members of the putative subclass will continue to be subject to settlement agreements that infringe on their right of access to the courts.

200.    Plaintiffs are entitled to a judgment that the City's policy or practice of using the threat of eviction to coerce property owners and leaseholders to waive their right of access to the courts is unconstitutional and must be enjoined.

201.    In addition, Plaintiffs are entitled to a judgment that settlement agreements obtained by the City in no-fault eviction cases purporting to waive the constitutional right of access to the courts are invalid and unenforceable.

<u>**Count V:**</u>
**VIOLATION OF 42 U.S.C. § 1983**
**COERCIVE WAIVER OF RIGHT**
**TO FAMILIAL ASSOCIATION**
**On Behalf Of Class Representatives Jameelah El-Shabazz And David Diaz**
**Individually And On Behalf Of The Familial Association Subclass**

202.    All preceding allegations are incorporated here as if set forth in full.

203.     The City pursues a policy or practice of requiring innocent individuals, as a condition of avoiding eviction in no-fault eviction cases, to sign agreements excluding immediate family members from their homes.

204.     The City pursues these agreements without regard to whether the individuals required to waive their right to familial association have been convicted or even accused of any crime. As a result, the City regularly imposes such agreements on individuals who have *not* been convicted or accused of any offense.

205.     The City follows this policy or practice notwithstanding Supreme Court precedent holding that the right to live with family is a constitutional right of fundamental importance. *See, e.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494 (1977).

206.     The City's policy or practice of using the threat of eviction to compel innocent leaseholders and property owners to waive their right to familial association violates the Due Process Clause of the Fourteenth Amendment.

207.     Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct. Without declaratory and injunctive relief, members of the putative subclass will continue to be subject to settlement agreements that infringe on their right to associate with family members in their home.

208.     Plaintiffs are entitled to a judgment that the City's policy or practice of using the threat of eviction to coerce innocent property owners and leaseholders to waive their right to familial association is unconstitutional and must be enjoined.

209.     In addition, Plaintiffs are entitled to a judgment that settlement agreements obtained by the City from innocent property owners and leaseholders in no-fault eviction cases purporting to waive the constitutional right to familial association are invalid and unenforceable.

46

## INDIVIDUAL COUNTS

### Count VI:
### VIOLATION OF 42 U.S.C. § 1983
### COERCIVE WAIVER OF RIGHT
### TO FAMILIAL ASSOCIATION
### On Behalf Of Jameelah El-Shabazz And David Diaz

210.    All preceding allegations are incorporated here as if set forth in full.

211.    The City, through threat of eviction under its no-fault eviction ordinance, coerced Jameelah El-Shabazz and David Diaz to agree to exclude family members from their respective apartments.

212.    The City did this even though the specific family members excluded by Jameelah and David were not accused by the City of any crime and in fact were not engaged in any criminal activity in their respective apartments.

213.    The City's actions, coercing Jameelah and David to waive their right to familial association, violate the Due Process Clause of the Fourteenth Amendment.

214.    Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct. Without declaratory and injunctive relief, Jameelah and David will continue to be subject to settlement agreements that infringe on their right to familial association.

215.    Plaintiffs are entitled to a judgment that the settlement agreements obtained from Jameelah and David are unconstitutional and unenforceable.

### Count VII:
### VIOLATION OF 42 U.S.C. § 1983
### COERCIVE WAIVER OF RIGHT
### TO BE FREE FROM WARRANTLESS SEARCHES
### On Behalf Of Sung Cho And Nagle Washrite LLC

216.    All preceding allegations are incorporated here as if set forth in full.

217.    The City, through threat of eviction under its no-fault eviction ordinance, coerced Sung Cho and Nagle Washrite LLC to agree to waive their Fourth Amendment right to be free from warrantless searches.

218.    The City did this even though (among other things) the City itself created the alleged criminal behavior underlying the eviction case; the criminal behavior alleged did not involve any act or omission by Sung or his employees; Sung cooperated with all previous requests for assistance by the NYPD; and the City had no grounds to believe that a waiver of Fourth Amendment rights would serve to prevent the kind of alleged criminal behavior underlying the eviction suit.

219.    The agreement coerced from Sung and Nagle Washrite LLC is particularly invalid because it purports to waive—in perpetuity—the Fourth Amendment rights of successor owners. An individual cannot waive future Fourth Amendment rights held by *someone else*.

220.    The City's actions, coercing Sung and Nagle Washrite LLC to waive their right to be free from warrantless searches and the future Fourth Amendment rights of other persons, violate the Due Process Clause of the Fourteenth Amendment.

221.    Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct. Without declaratory and injunctive relief, Sung and Nagle Washrite LLC will continue to be subject to a settlement agreement that infringes on their right to be free from warrantless searches.

222.    Plaintiffs are entitled to a judgment that the settlement agreement obtained from Sung and Nagle Washrite LLC is unconstitutional and unenforceable.

**Count VIII:**
**VIOLATION OF 42 U.S.C. § 1983**
**COERCIVE WAIVER OF RIGHT**
**OF ACCESS TO THE COURTS**
**On Behalf Of Sung Cho And Nagle Washrite LLC**

223.    All preceding allegations are incorporated here as if set forth in full.

224.    The City, through threat of eviction under its no-fault eviction ordinance, coerced Sung Cho and Nagle Washrite LLC to agree to waive the right to access the courts to obtain a hearing before a neutral judge prior to imposition of further sanctions.

225.    The City did this even though (among other things) the City itself created the alleged criminal behavior underlying the eviction case; the criminal behavior alleged did not involve any act or omission by Sung or his employees; and the City had no grounds to believe that a waiver of the right of access to the courts would serve to prevent the kind of alleged criminal behavior underlying the case.

226.    The agreement coerced from Sung and Nagle Washrite LLC is particularly invalid because it purports to waive—in perpetuity—the due process rights of successor owners. An individual cannot waive future constitutional rights held by *someone else*.

227.    The City's actions, coercing Sung and Nagle Washrite LLC to waive their due process right of access to the courts and the future rights of other persons, violate the Due Process Clause of the Fourteenth Amendment.

228.    Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct. Without declaratory and injunctive relief, Sung and Nagle Washrite LLC will continue to be subject to a settlement agreement that infringes on their right of access to the courts.

229.    Plaintiffs are entitled to a judgment that the settlement agreement obtained from Sung and Nagle Washrite LLC is unconstitutional and unenforceable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.  Certify this case as a class action under Federal Rule of Civil Procedure 23(b)(2) on

    behalf of the following proposed Plaintiff Classes and Subclasses:

        (i)      Closing Order Class: All persons (natural or incorporated) who are

                  currently subject to or who will enter into agreements with the City of

                  New York to settle no-fault eviction actions following entry of an *ex parte*

                  closing order;

        (ii)     Innocent Occupant Class: All persons (natural or incorporated) who are

                  currently subject to or who will enter into agreements with the City of

                  New York to settle no-fault eviction actions and who have not been

                  convicted of the alleged underlying criminal offense;

        (iii)   Warrantless Search Subclass: All members of the Innocent Occupant

                  Class whose agreements consent to warrantless searches of their home or

                  business, including both searches of the physical premises and video

                  surveillance;

        (iv)   Access to Court Subclass: All members of the Innocent Occupant Class

                  whose agreements consent to imposition of penalties for alleged future

                  unlawful behavior without a prior judicial hearing;

        (v)     Familial Association Subclass: All members of the Innocent Occupant

                  Class whose agreements require them to exclude immediate family

                  members (spouses, children, step-children, parents, step-parents, siblings,

                  or half-siblings) from their home;

B.   Designate the following proposed Class Representatives as representatives of the
Plaintiff Class and Subclasses:

    (i)    Closing Order Class: David Diaz and Jameelah El-Shabazz;

    (ii)    Innocent Occupant Class: Sung Cho, David Diaz, Jameelah El-Shabazz,
and Nagle Washrite LLC;

    (iii)    Warrantless Search Subclass: Sung Cho and Nagle Washrite LLC;

    (iv)    Access to Courts Subclass: Sung Cho and Nagle Washrite LLC;

    (v)    Familial Association Subclass: David Diaz and Jameelah El-Shabazz;

C.   Designate Plaintiffs' counsel of record as Class Counsel for the Plaintiff Class and
Subclasses;

D.   Enter the following class- and subclass-wide declaratory orders:

    (i)    Closing Order Class: Declare unconstitutional, invalid, and unenforceable
all settlement agreements exacted by the City of New York in no-fault
eviction actions following entry of an *ex parte* closing order;

    (ii)    Innocent Occupant Class: Declare unconstitutional, invalid, and
unenforceable all settlement agreements exacted by the City of New York
in no-fault eviction actions brought against property owners and
leaseholders not convicted of the alleged underlying crime;

    (iii)    Warrantless Search Subclass: Declare unconstitutional, invalid, and
unenforceable all agreements consenting to warrantless searches exacted
by the City of New York in no-fault eviction actions brought against
members of the Innocent Occupant Class;

      (iv)     Access to Courts Subclass: Declare unconstitutional, invalid, and unenforceable all agreements consenting to imposition of penalties for alleged unlawful behavior without judicial oversight exacted by the City of New York in no-fault eviction actions brought against members of the Innocent Occupant Class;

      (v)     Familial Association Subclass: Declare unconstitutional, invalid, and unenforceable all agreements to exclude immediate family members (spouses, children, step-children, parents, step-parents, siblings, or half-siblings) exacted by the City of New York in no-fault eviction actions brought against members of the Innocent Occupant Class;

E.  Enter the following class-wide injunctive orders:

      (i)     Closing Order Class: Permanently enjoin Defendants from enforcing agreements exacted in no-fault eviction actions following entry of an *ex parte* closing order and from obtaining such agreements in the future;

      (ii)     Innocent Occupant Class: Permanently enjoin Defendants from enforcing agreements exacted in no-fault eviction actions brought against property owners and leaseholders not convicted of the alleged underlying crime and from obtaining such agreements in the future;

      (iii)     Warrantless Search Subclass: Permanently enjoin Defendants from enforcing agreements consenting to warrantless searches exacted in no-fault eviction actions brought against members of the Innocent Occupant Class and from obtaining such agreements in the future;

     (iv)    Access to Courts Subclass: Permanently enjoin Defendants from enforcing agreements consenting to imposition of penalties for alleged unlawful behavior without judicial oversight exacted in no-fault eviction actions brought against members of the Innocent Occupant Class and from obtaining such agreements in the future;

     (v)    Familial Association Subclass: Permanently enjoin Defendants from enforcing agreements to exclude immediate family members (spouses, children, step-children, parents, step-parents, siblings, or half-siblings) exacted in no-fault eviction actions brought against members of the Innocent Occupant Class and from obtaining such agreements in the future;

F.  Declare the agreements exacted from Plaintiffs Sung Cho, David Diaz, Jameelah El-Shabazz, and Nagle Washrite LLC in their respective no-fault eviction actions unconstitutional, invalid, and unenforceable;

G.  Permanently enjoin the City of New York and the New York Police Department from enforcing the agreements exacted from Plaintiffs Sung Cho, David Diaz, Jameelah El-Shabazz, and Nagle Washrite LLC in their respective no-fault eviction actions;

H.  Award each Named Plaintiff nominal damages in the amount of $10.00;

I.  Award attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable statute or rule, or in equity; and

J.  Award such other and further relief, including injunctive and declaratory relief, as the Court may deem just and proper.

Dated this 12th day of October, 2016.        Respectfully submitted,


   /s/  Robert Everett Johnson

Ana-Claudia Roderick (ACR 9367)    Darpana M. Sheth (DS 1976)
GOLENBOCK EISEMAN    Robert Everett Johnson*
ASSOR BELL & PESKOE LLP    Milad Emam*
711 Third Avenue    INSTITUTE FOR JUSTICE
New York, NY 10017    901 North Glebe Road, Suite 900
Tel: (212) 907-7300    Arlington, VA 22203
Fax: (212) 754-0330    Tel: (703) 682-9320
Email: aroderick@golenbock.com    Fax: (703) 682-9321
    Email: dsheth@ij.org
        rjohnson@ij.org
        memam@ij.org


*Pro Hac Vice* Pending

*Attorneys for Plaintiffs Sung Cho, David Diaz, Jameelah El-Shabazz,*
*Nagle Washrite LLC, and the Plaintiff Classes*